**EFiled: Jul 09 2018 01:16PM EDT**
**Transaction ID 62217937**
**Case No. 2017-0847-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PENTON BUSINESS MEDIA HOLDINGS, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 2017-0847-JTL ) |
| INFORMA PLC and INFORMA USA, INC., | ) ) ) |
| Defendants. | ) ) ) |
| INFORMA PLC and INFORMA USA, INC., | ) ) ) |
| Counterclaim-Plaintiffs, | ) ) |
| v. | ) ) |
| PENTON BUSINESS MEDIA HOLDINGS, LLC, | ) ) ) |
| Counterclaim-Defendant. | ) ) |

## MEMORANDUM OPINION

Date Submitted: May 11, 2018
Date Decided: July 9, 2018

William M. Lafferty, John P. DiTomo, Coleen Hill, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Craig S. Primis, Erin C. Johnston, Matthew S. Brooker, KIRKLAND & ELLIS LLP, Washington, District of Columbia; *Attorneys for Plaintiff/Counterclaim-Defendant*.

Kevin R. Shannon, Christopher N. Kelly, Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Anthony M. Candido, Robert C. Myers, Benjamin A. Berringer, CLIFFORD CHANCE US LLP, New York, New York; *Attorneys for Defendants/Counterclaim-Plaintiffs*.

**LASTER, V.C.**

Informa PLC and Informa USA, Inc. (jointly, the "Buyer") purchased Penton Business Media Holdings, Inc. (the "Company") from Penton Business Media Holdings, LLC (the "Seller"). The transaction was governed by an Agreement and Plan of Merger dated September 15, 2016 (the "Merger Agreement").

The Merger Agreement contained complex provisions addressing how the value of transaction-related tax benefits would be allocated between the Buyer and the Seller. Those provisions incorporated a dispute resolution mechanism that called for the parties to submit disputes to an independent accounting firm. The Merger Agreement stated that the accountant "shall be acting as an accounting expert only and not as an arbitrator."

Disputes arose, but the parties could not agree on procedures for submitting the disputes to the accountant. The Seller wanted to provide the accountant with term sheets and other extrinsic evidence to support its position. The Buyer contended that the accountant could not consider extrinsic evidence.

The Seller filed this lawsuit. Invoking the doctrine of procedural arbitrability, the Seller seeks a declaration that the accountant has authority to determine what information it can consider. Alternatively, the Seller seeks a declaration that the accountant can consider extrinsic evidence. The Buyer filed a counterclaim. The Buyer contends that because the accountant is an expert and not an arbitrator, arbitral doctrines are irrelevant, and the court must decide the issue as a matter of contract interpretation. The Buyer seeks a declaration that the accountant cannot consider extrinsic evidence, along with other equitable relief.

The parties filed cross motions for judgment on the pleadings. This decision holds that the Merger Agreement calls for an expert determination, which is a third-party dispute

1

resolution mechanism distinct from arbitration. Although some jurisdictions do not recognize the distinction, Delaware does. When parties have opted for an expert determination, doctrines like substantive and procedural arbitrability do not apply. Although parties could give an expert the authority to interpret a contract, here they did not. Instead, the court must interpret the contract to determine what the accountant can consider. In this case, the plain terms of the Merger Agreement bar the accountant from considering extrinsic evidence.

## I. FACTUAL BACKGROUND

On a motion for judgment on the pleadings, the facts are drawn from the operative pleadings and the documents they incorporate by reference. When evaluating cross motions for judgment on the pleadings, the facts for purposes of each motion must be viewed in the light most favorable to the non-movant. In this case, the relevant facts are undisputed.

### A. The Term Sheets

In summer 2016, the parties began discussing a potential transaction. On July 6, the Buyer sent the Seller a term sheet that included a section addressing tax matters. The Seller contends that the term sheet supports its position in the underlying dispute.

After further negotiations, the parties circulated a revised term sheet on July 19, 2016. It too contained a section on tax matters. The Seller believes that it too supports its position in the underlying dispute.

### B. The Merger Agreement

The parties entered into the Merger Agreement and announced it on September 15, 2016. It called for the Company to merge with a wholly owned subsidiary of the Buyer,

with the Company as the surviving entity (the "Merger"). The purchase price comprised $1.46 billion in cash and $100 million in Buyer equity.

On the same day that the parties announced the Merger, the Buyer announced a rights offering to finance the transaction. The offering circular contained information that the Seller contends supports its position in the underlying dispute.

## C.    The Tax Provisions

Section 5.2 of the Merger Agreement contains a complex mechanism for apportioning tax deductions and other tax benefits that the Company could claim as a result of the Merger. The parties grouped the benefits into three categories: (i) benefits applied to pre-Merger periods, (ii) benefits applied to post-Merger periods, and (iii) benefits that remained unapplied as of a set date. The first two categories are pertinent to this case.

Section 5.2(a)(i) governed the allocation of tax benefits for periods ending on or before the closing date of the Merger (the "Pre-Closing Periods"). This decision therefore calls it the "Pre-Closing Section." It directed the Buyer to pay the Seller an amount equal to any refund that the Company received because of tax benefits that the Company applied to a Pre-Closing Period. Critically for the underlying dispute, the Seller only would receive a payment equal to the *refund*. The Seller would not be entitled to receive a portion of the value of the tax benefits that were utilized to reduce the Company's tax liability except to the extent they resulted in a refund.

Section 5.2(a)(ii) governed the allocation of tax benefits for periods that ended after closing, with the final post-closing period ending on December 31, 2017 (the "Post-Closing Periods"). This decision therefore calls it the "Post-Closing Section." It deployed the

3

defined term "Transaction Tax Benefits," which included "any reduction in the [Company's] Tax liability" for any Post-Closing Period.[1] It directed the Buyer to pay the Seller an amount equal to 40% of any Transaction Tax Benefits that the Company realized during a Post-Closing Period. Unlike the Pre-Closing Section, the Post-Closing Section did not require a refund. The Post-Closing Section required a payment equal to the reduction in the Company's tax liability even if the Company did not receive a refund.

The different formulas for calculating the payment to the Seller meant that if the Buyer could allocate benefits to Pre-Closing Periods rather than Post-Closing Periods, then the Buyer could pay less to the Seller. A particular tax benefit might generate the same dollar-value reduction in potential tax liability for either a Pre-Closing or a Post-Closing Period, but the Buyer would only pay for the benefit in a Pre-Closing Period to the extent it resulted in a refund; for a Post-Closing Period, the Buyer would always make a payment to the Seller equal to 40% of the benefit.

### D.    The Dispute Resolution Mechanism

The Pre-Closing and Post-Closing Sections piggybacked on a dispute resolution mechanism that Section 2.8 of the Merger Agreement established for disputes over purchase-price adjustments, such as disagreements over the closing-date balance sheet (the "Dispute Resolution Provision"). If a dispute over a purchase-price adjustment arose, then the Dispute Resolution Provision called for the parties to engage in commercially

---

[1] Compl. Ex. C § 5.2(a)(ii).

4

reasonable efforts to resolve it for a period of thirty days. If those efforts failed, the Dispute Resolution Provision stated that "unless otherwise agreed by the [Seller] and [the Buyer], the remaining items in dispute shall be submitted promptly to Ernst & Young."[2] The Dispute Resolution Provision incorporated methods for selecting an alternative accountant if Ernst & Young could not serve, and it therefore defined the holder of the adjudicative role generically as the "Accounting Firm."[3]

Section 2.8(b)(ii) of the Merger Agreement called for the Accounting Firm to make "a determination of each disputed item within forty-five (45) days after referral of the matter to such Accounting Firm, which determination must be in writing and must set forth, in reasonable detail, the basis therefor."[4] It further specified that "[a]ny such determination must be based solely on" three categories of information:

(i) the definitions and other applicable provisions of this Agreement,

(ii) a single presentation (which presentations shall be limited to the remaining items in dispute set forth in the Proposed Closing Date Calculations and Purchase Price Dispute Notice) submitted by each of [the Buyer] and the [Seller] to the Accounting Firm within fifteen (15) days after the engagement thereof (each of which the Accounting Firm shall forward simultaneously to [the Buyer] or the [Seller], as applicable, once both such presentations are received) and

(iii) one written response submitted to the Accounting Firm within ten (10) Business Days after receipt of each such other party's presentation (each of which the Accounting Firm shall forward simultaneously to [the Buyer] or

---

[2] *Id.* § 2.8(b)(ii).

[3] *Id.*

[4] *Id.*

5

the [Seller], as applicable, once both such presentations are received), and not on an independent review.[5]

Having specified what the Accounting Firm could consider, and having included an aside about what the Accounting Firm could not do ("an independent review"), the Dispute Resolution Provision went on to specify other sources of information that the Accounting Firm could not consider:

> The parties agree that no *ex parte* conferences, oral examinations, testimony, depositions, discovery or other form of evidence gathering or hearings shall be conducted or allowed by the Accounting Firm; provided, however, that at the Accounting Firm's request, or as mutually agreed by [the Buyer] and the [Seller], [the Buyer] and the [Seller] may meet with the Accounting Firm so long as Agents of both parties are present.[6]

The parties further agreed that "[i]n resolving the items in dispute, . . . the Accounting Firm shall be acting as an accounting expert only and not as an arbitrator and shall not import or take into account usage, custom or other extrinsic factors."[7]

The Dispute Resolution Provision also contained language requiring that the parties agree on the terms of engagement for the Accounting Firm. This language appeared in a sentence primarily devoted to allocating fees and expenses:

> The terms of appointment and engagement of the Accounting Firm shall be as reasonably agreed upon between the [Seller] and [the Buyer], and any associated engagement fees shall be borne by [the Buyer] and the [Seller] . . . in the same proportion as the aggregate amount of the disputed items that is unsuccessfully disputed by each such party (as determined by the Accounting

---

[5] *Id.* (formatting added).

[6] *Id.*

[7] *Id.*

6

Firm) bears to the total amount of the disputed items submitted to the Accounting Firm.[8]

All of these details appeared in one lengthy block paragraph in Section 2.8(b)(ii). To reiterate, that was the portion of the Merger Agreement devoted to purchase-price adjustments.

Both the Pre-Closing and Post-Closing Sections incorporated the Dispute Resolution Provision by reference, albeit tersely. The Pre-Closing Section directed the Company to prepare tax forms for the Pre-Closing Periods and provide them to the Seller for review. It then stated: "Dispute resolution provisions corresponding to those in <u>Section 2.8(b)</u> shall apply in case the parties cannot agree on the substance contained in these forms provided to the [Seller] for its review and comment."[9] That was it.

The Post-Closing Section was marginally less laconic. Like the Pre-Closing Section, the Post-Closing Section required that the Buyer give the Seller a copy of its schedules and calculations for the Seller's "review, comment, and consent."[10] It provided that if the Seller disputed any item, then the parties would "cooperate in good faith to resolve the dispute" for a period of thirty days. It then stated that if the dispute persisted, then "the determination of the disputed item or items shall be made by the Accounting Firm following the general procedures set forth in Section 2.8(b)(ii), *mutatis mutandis*, whose decision shall be final

---

[8] *Id.*

[9] *Id.* § 5.2(a)(i).

[10] *Id.* § 5.2(a)(ii).

and whose fees shall be shared equally by [the Buyer], on the one hand, and the [Seller] on the other hand."[11]

The Merger Agreement included a forum selection clause for all disputes not covered by the Dispute Resolution Provision. Section 9.17 stated that "[e]xcept as provided by Section 2.8(b) and Section 5.2," the parties submitted to the jurisdiction of the Delaware courts "in any action arising out of or relating to this Agreement."[12] The parties further agreed "that all claims in respect of such action may be heard and determined in any such court and . . . not to bring any action arising out of or relating to this Agreement in any other court."[13]

### E.     The Tax Dispute

The Merger closed on November 2, 2016. On December 21, the Buyer sent the Seller a proposed tax form that showed the Company offsetting its liability for Pre-Closing Periods with $40 million of transaction-related tax deductions. The Company anticipated a resulting tax refund of approximately $600,000, which the Buyer would owe to the Seller. The real economic consequence of this allocation was to remove the $40 million of

---

[11] *Id.* Attentive readers will note that the thirty-day consultation was superfluous, because one was already part of the general procedures set forth in the Dispute Resolution Provision. Presumably the parties did not want a two-stage consultation adding up to sixty days of good faith negotiation. The Post-Closing Section's incorporation by reference of the Dispute Resolution Provision also used the Latinism "*mutatis mutandis*," whereas the Pre-Closing Section's did not. The Pre-Closing Section contemplated a "corresponding" procedure. I do not perceive any meaningful difference between the Latin and the English.

[12] *Id.* § 9.17.

[13] *Id.*

transaction-related tax deductions from the amounts that the Company could apply to Post-Closing Periods. If the Company had used those deductions for Post-Closing Periods, then the Post-Closing Section would have required the Buyer to pay 40% of the value of those deductions to the Seller, or roughly $16 million.

The Buyer's allocation did not please the Seller. By letter dated January 24, 2017, the Seller disputed whether the Buyer could allocate the transaction-related tax deductions in this manner.[14] In a subsequent letter, the Seller supported its position by referring to extrinsic evidence, including the term sheets and the rights offering circular.[15]

## F.    The Disagreement Over Ernst & Young's Role

When the parties failed to resolve the dispute, the Seller invoked "the dispute resolution procedures set forth in Section 5.2(a)(ii) and Section 2.8(b) of the Merger Agreement."[16] The parties turned to negotiating the terms of Ernst & Young's engagement.

The parties agreed to ask Ernst & Young the following question: "What amount of the Transaction Tax Deductions shown on the attached schedule is to be treated as 'Aggregate Post-Closing Tax Deductions' (as such term is defined in the Merger Agreement)?"[17] The parties also agreed on the list of transaction-related tax deductions that

---

[14] Countercl. Ex. A.

[15] Countercl. Ex. B-2.

[16] Countercl. Ex. B-4.

[17] Countercl. Ex. C-8. The Merger Agreement contained a lengthy definition of "Aggregate Post-Closing Tax Deductions," which itself relied on many defined terms. At

9

Ernst & Young needed to address. They even agreed on which individuals to use at Ernst & Young.[18]

But the parties could not agree on what information Ernst & Young could consider. The Buyer posited that the language of Ernst & Young's engagement letter should track the Dispute Resolution Provision and specify that Ernst & Young "shall not take into account any usage, custom or other extrinsic factors."[19] The Seller disagreed, arguing that

> this issue is quite different from a working capital dispute, where the accounting principles are defined and the exercise is basically a straightforward numerical/accounting exercise. For this reason, Section 5.2 of the Merger Agreement does not state that a dispute over tax matters is to be resolved using procedures "identical" to those in Section 2.8(b) or that such process is to follow "all" of the procedures set forth in Section 2.8(b). Rather, Section 5.2 states that the process is to be one "corresponding" with the process in 2.8(b), which is wording intended to signal that the process is to be similar or analogous to the one in Section 2.8(b), but not necessarily identical.[20]

The Seller wanted to provide Ernst & Young with extrinsic evidence, including the term sheets and offering circular, to support its position.

The Buyer viewed the Seller's proposal as inconsistent with the language in the Dispute Resolution Provision which specified that Ernst & Young would be acting as an expert and not as an arbitrator:

---

a high level, the Aggregate Post-Closing Tax Deductions comprised the subset of deductions that would be used to calculate the Seller's 40% payment.

[18] *See* Countercl. Exs. C-1, C-2, C-3, C-4.

[19] Countercl. Ex. C-5.

[20] Countercl. Ex. C-6.

A key principle in Section 2.8(b)(ii), which has equal application to accounting and tax disputes, is that the Accounting Firm is being engaged to act as an expert and not as an arbitrator. Accordingly, the Accounting Firm may not review and weigh extrinsic evidence. Instead, the Accounting Firm is expected to bring its technical expertise in accounting (or tax matters in this case) to bear on questions submitted by the parties, and to determine the answers to those questions based solely on the definitions and other applicable provisions set forth in the Merger Agreement. Consistent with this key principle, Section 2.8(b)(ii) rightly rules out, among other things, oral examinations, testimony, discovery and depositions. These are all fundamentally important, specifically-negotiated, customary and basic elements of what the parties agreed in Section 2.8(b), are designed to limit the scope of Ernst & Young's authority to its particular expertise, and in order to be "corresponding," the dispute resolution procedures we agree [to] with Ernst & Young must reflect these basic elements.[21]

The Seller was not convinced.

The Seller next proposed that the parties present their disagreement to Ernst & Young and let the accountants decide what they would consider.[22] The Buyer did not like that option, contending that the engagement letter needed to spell out Ernst & Young's duties.[23] This was necessary, the Buyer said, because Ernst & Young "is not bound by the provisions of the merger agreement, but is bound by the terms of its engagement letter."[24] Further exchanges ensued, but they did not add meaningfully to the dispute.

---

[21] Countercl. Ex. C-7.

[22] Countercl. Ex. C-8.

[23] Countercl. Ex. C-9.

[24] *Id.*

**G. This Litigation**

On November 26, 2017, the Seller filed suit. Its complaint seeks alternative declaratory judgments. The Seller prefers a declaration that Ernst & Young has the authority to determine what evidence it can consider when addressing an issue pursuant to the Dispute Resolution Provision. Alternatively, the Seller would like a declaration that Ernst & Young can consider extrinsic evidence.

The Buyer answered and filed a counterclaim, which it later amended. The operative counterclaim contains four counts. Count I seeks declarations that (i) Ernst & Young's engagement is subject to the limitations in the Dispute Resolution Provision and (ii) the Seller's refusal to engage Ernst & Young to date breaches the Dispute Resolution Provision. Count II seeks a mandatory injunction compelling the parties to engage Ernst & Young and complete the dispute resolution process on terms consistent with the declaration sought by Count I. Count III seeks a declaration that this court, rather than Ernst & Young, must consider the Seller's proposed interpretation and that it is incorrect. Count IV seeks an injunction prohibiting the Seller from advancing its contract interpretation arguments before Ernst & Young.

## II. LEGAL ANALYSIS

The parties have cross-moved for judgment on the pleadings. "In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light

most favorable to the non-moving party."[25] "A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[26] [J]judgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[27]

## A.    Who Decides What Ernst & Young Can Consider?

The parties dispute whether Ernst & Young has authority to decide what types of materials it can consider. The first step in the analysis requires determining whether the Dispute Resolution Provision calls for an arbitration or an expert determination.[28]

If the Dispute Resolution Provision calls for an arbitration, then the familiar doctrines of substantive and procedural arbitrability will govern:

> Substantive arbitrability issues are gateway questions about the scope of an
> arbitration and its applicability to a given dispute. The court presumes that

---

[25] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) (footnote omitted).

[26] *Id.*

[27] *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).

[28] *See generally* N.Y.C. Bar Comm. on Int'l Commercial Arbitration, *Purchase Price Adjustment Clauses and Expert Determinations: Legal Issues, Practical Problems and Suggested Improvements* (2013) [hereinafter New York Bar Report]. American jurisdictions, including Delaware, have not yet widely embraced the term "expert determination," and the doctrines that govern this area of the law traditionally spoke in terms of "appraisement." *Id.* at 2-3. In a scholarly and (in my view) highly persuasive report, a committee of the New York City Bar Association recommends using the term "expert determination" to help clarify the law. In England, where this body of law is well developed, the term "expert determination" is ubiquitous. *See* Clive Freedman & James Farrell, *Kendall on Expert Determination* 4-5 (5th ed. 2015). This decision therefore uses the term "expert determination."

parties intended courts to decide issues of substantive arbitrability. The opposite presumption applies to procedural arbitrability issues, such as waiver, or satisfaction of conditions precedent to arbitration.[29]

If this framework applies, then Ernst & Young can decide the issue, because "[t]he Delaware Supreme Court has made clear that procedural arbitrability also includes questions about what evidence the arbitrator should consider in deciding the dispute."[30]

If the Dispute Resolution Provision calls for an expert determination, then different rules apply.[31] Most notably for the current case, the body of law governing arbitrations, including the distinction between substantive and procedural arbitrability, is irrelevant.[32] Instead, the court must interpret and apply the contract.[33]

1.    **Does Delaware Recognize A Distinction Between An Arbitration And An Expert Determination?**

The buyer posits that arbitral principles, including the doctrines of substantive and procedural arbitrability, always apply whenever parties have selected a private third-party

---

[29] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).

[30] *TIMP Participants LLC v. DSW Gp. Hldgs. LLC*, 2016 WL 490257, at *9 (Del. Ch. Feb. 4, 2016) (citing *Viacom Int'l, Inc. v. Winshall*, 72 A.2d 78, 83-34 (Del. 2013)).

[31] *See* New York Bar Report, *supra*, at 5-6 (summarizing differences). Differences include requisite procedures, due process constraints, the standard of judicial review, and whether and how the results may be judicially confirmed. *See id.*; *see also* Freedman & Farrell, *supra*, at 426-29 (discussing "procedural differences" between expert determination and arbitration). Neither these nor other distinctions are at issue in this case.

[32] *See* New York Bar Report, *supra*, at 4, 49.

[33] *See Senior Hous. Capital, LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *24 (Del. Ch. May 13, 2013) (Strine, C.); *see also Alliant Techsystems, Inc. v. MidOcean Bushnell Hldgs., L.P.*, 2015 WL 1897659, at *1 (Del. Ch. Apr. 27, 2015).

14

to decide a dispute. They rely on cases which hold that "[i]f the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration."[34] In my view, those cases speak too broadly. Most importantly for present purposes, Delaware decisions distinguish between expert determinations and arbitrations.

Until the passage of the Federal Arbitration Act (the "FAA"), the distinction between arbitrations and expert determinations was widely recognized. It was a feature of English commercial and legal practice at the time of the separation of the colonies, and English courts have a well-developed jurisprudence in this area.[35] After the separation, state courts recognized the distinction throughout the nineteenth century.[36]

---

[34] *Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir. 2013) (internal quotation marks and citation omitted); *see also McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co.*, 858 F.2d 825 (2d Cir. 1988); *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456 (E.D.N.Y. 1985).

[35] *See* Freedman & Farrell, *supra*, at 4-5 (discussing history); *see also, e.g.*, *Leeds v. Burrows* (1810) 104 Eng. Rep. 1, 3; 12 East 1, 6 (examining a case in which "the defendant promised to pay the plaintiff so much money as certain referees should appraise and value [certain] goods at" and "appointing persons to settle an account of what was due between the parties for the value of the different articles" as a remedy in lieu of a precise cash judgment because "[t]he parties had not contemplated of submitting any differences to the award of arbitrators, and no such terms aught to be imposed upon them against their own meaning"). The term "expert" entered England's judicial lexicon as early as 1878. *See Bottomley v. Ambler* (1878) 38 LT 545, 546 ("You agree to refer the matter to a person who is an expert as an expert.").

[36] *See, e.g.*, *Palmer v. Clark*, 106 Mass. 373, 389 (Mass. 1871) ("A reference to a third person to fix by his judgment the price, quantity or quality of material, to make an appraisement of property and the like, especially when such reference is one of the stipulations of a contract founded on other and good considerations, differs in many respects from an ordinary submission to arbitration."); *Cal. Annual Conference of M.E. Church v. Seitz*, 15 P. 839, 841 (Cal. 1887) (holding that a contract before it constituted "a mere appraisement or valuation, which, although binding upon the parties, is not a

15

In 1910, the United States Supreme Court addressed the distinction in a case involving the valuation of a waterworks plant that a city had agreed to purchase.[37] The panel of appraisers who valued the plant heard evidence without a city representative present, which the city claimed violated the rights to which it was entitled in an arbitration. The Supreme Court disagreed, explaining that the proceeding had not been an arbitration:

> If this was a technical arbitration of a matter of dispute or difference between the parties, to be heard and decided upon evidence submitted, the examination of the company's books without the consent of the city or the presence of its representatives would be such misconduct as would vitiate the award. In such a matter, the rules relating to judicial inquiry would apply. But in an appraisement, such as that here involved, the strict rules relating to arbitration and awards do not apply, and the appraisers were not rigidly required to confine themselves either to matters within their own knowledge, or those submitted to them formally in the presence of the parties; but might reject, if they saw fit, evidence so submitted, and inform themselves from any other source, as experts who were at last to act upon their own judgment.[38]

The Supreme Court observed that the panel was "made up of such engineers, selected because they [are] experts," who were expected "to examine and estimate the value and acquaint themselves with the condition and extent of the property in question in their own way, and not according to the procedure required in a judicial proceeding."[39] The Supreme

---

submission of a controversy to arbitration, and is therefore not subject to the rules which govern arbitrations").

[37] *City of Omaha v. Omaha Water Co.*, 218 U.S. 180 (1910).

[38] *Id.* at 198.

[39] *Id.* at 196.

Court held that "[i]n the absence of any evidence of actual bad faith" the determination would stand.[40]

Unfortunately, subsequent developments blurred once-clear doctrine. The passage of the FAA in 1925, the articulation of a strong federal policy in favor of arbitration, and the adoption of comparable arbitration acts and policies at the state level led to rules that favored arbitration. As litigants sought to escape from court into an arbitral forum, and judges sought subconsciously to lighten heavy dockets, arbitral principles seeped into and, in some jurisdictions, swamped the law governing expert determinations. One national survey posits that only twenty-four states continue to recognize a distinction between experts and arbitrators.[41] In twenty-two states, the distinction has been lost, and in four the matter has either been resolved ambiguously or not at all.[42] At the federal level, the United States Courts of Appeals have split on whether an expert determination constitutes an arbitration under the FAA.[43]

---

[40] *Id.* at 198.

[41] Lina M. Colón Santiago, *Insurance Appraisal & Arbitration*, 8 No. 1 U. Puerto Rico Bus. L.J. 65, 74 (2016).

[42] *Id.*

[43] *See generally* Daniel Burkhart, Note, *Agree to Disagree: The Circuit Split on the Definition of "Arbitration"*, 92 U. Det. Mercy L. Rev. 57 (2015). Early decisions from the courts of appeals considered state law when trying to determine whether an expert determination constituted an arbitration. *See Hartford Lloyd's Ins. Co. v. Teachworth*, 898 F.2d 1058, 1061-63 (5th Cir. 1990) (applying Texas law); *Wasyl, Inc. v. First Bos. Corp.*, 813 F.2d 1579, 1581-82 (9th Cir. 1987) (applying California law). *But see Portland Gen. Elec. Co. v. U.S. Bank Tr. Nat'l Ass'n as Tr. for Tr. No. 1*, 218 F.3d 1085, 1091 (9th Cir. 2000) (Tashima, J., concurring) (expressing doubt about *Wasyl*); *id.* at 1091-92

Delaware decisions have maintained the distinction between an arbitration and an expert determination.[44] In 2003, the Delaware Supreme Court considered a dispute under an insurance policy which provided that a panel of appraisers would determine the amount of a loss and stated that the panel's determination would "be binding."[45] The panel's determination included costs that the policy expressly excluded, and the determination exceeded coverage limits in certain respects. When the insurer sued for a declaratory judgment that the determination violated the terms of the policy, the Delaware Superior

(McKeown, J., specially concurring) (same). Later circuit decisions applied federal common law. *See Bakoss*, 707 F.3d 140; *Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684 (6th Cir. 2012); *Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc.*, 390 F.3d 684 (10th Cir. 2004); *Fit Tech, Inc. v. Bally Total Fitness Hldg. Corp.*, 374 F.3d 1 (1st Cir. 2004).

[44] *Collison v. Deisem*, 265 A.2d 57, 59 (Del. Ch. 1970) ("[A]rbitration . . . differs fundamentally from appraisal."); *see Hanby v. Md. Cas. Co.*, 265 A.2d 28, 31 (Del. 1970) ("Appraisal will determine the amount of loss and the Court then may be called upon to determine what effect should be given to the findings of the appraisers."); *Morris, Nichols, Arsht & Tunnell v. R-H Int'l, Ltd.*, 1987 WL 33980, at *4 (Del. Ch. Dec. 29, 1987) (citing *Collision* for the proposition that "this Court has held that an appraisal procedure is not the equivalent of arbitration" and declining a stay in favor of arbitration on that basis); *Pullman, Inc. v. Phoenix Steel Corp.*, 304 A.2d 334, 339 (Del. Super. 1973) ("An agreement for arbitration ordinarily encompasses the disposition of the entire dispute between the parties on which award a judgment may be entered. In contrast, appraisal extends only to a determination of actual cash value, all other issues being reserved for decision by a court."); *see also Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) (holding that "referee clause" did not call for arbitration). *But see Closser v. Penn Mut. Fire Ins. Co.*, 457 A.2d 1081, 1087 (Del. 1983) ("[S]ince the policy states that 'an award in writing so itemized, of any two when filed with this Company shall determine the amount of actual cash value and loss,' we construe the appraisal provisions of the policy, if invoked, to provide a mandatory form of arbitration, precluding recourse to the courts.").

[45] *AIU Ins. Co. v. Lexes*, 815 A.2d 312, 313 (Del. 2003).

Court applied an arbitral standard of review and dismissed. The Superior Court held that the panel's determination would stand "absent fraud or a completely irrational result."[46] The Delaware Supreme Court reversed, explaining that those types of issues were not waived "by an appraisal clause."[47] The Delaware Supreme Court held that when a contract calls for an expert determination by an appraiser, "it is for the court, not the appraiser, to decide the scope of the submission where that question is in dispute."[48]

Delaware authorities have applied the distinction between expert determinations and arbitration when interpreting dispute resolution provisions in transaction agreements. In *ASQR India Private, Ltd. v. Bureau Veritas Holdings, Inc.*,[49] the parties to an asset purchase agreement anticipated that disputes might arise over which customer contracts the buyer was acquiring. The parties agreed to a "Referee Procedure" under which a representative from a relevant industrial board would decide which customer contracts fell within the scope of the agreement. The agreement specified that "in performing such review, the Referee shall be functioning as an expert and not as an arbitrator."[50] The parties later locked horns over "a number of procedural and factual determinations about how to

---

[46] *Id.* at 312.

[47] *Id.* at 314.

[48] *Id.* (quoting *Cambridge St. Metal Co., Inc. v. Corrao*, 566 N.E.2d 1145, 1148 (Mass. App. Ct. 1991)).

[49] 2009 WL 1707910 (Del. Ch. June 16, 2009) (Strine, V.C.).

[50] *Id.* at *7.

19

implement the Referee Procedure."[51] One side asked the court to resolve these issues; the other side argued that the expert should resolve them. Chief Justice Strine, writing as a Vice Chancellor, declined to apply arbitral doctrines, holding that the authority to resolve the disputes lay with the court, "and not with the Referee, whose scope of authority is limited to specific, technical questions."[52] He reasoned that the Referee Procedure was "a narrow dispute resolution mechanism" that was "designed to take advantage of the technical expertise, rather than the arbitration skills, of the Referee, and is only triggered when the parties teed up a narrow, technical question in the course of the Review Process."[53]

More recently, in *EMSI Acquisition, Inc. v. Contrarian Funds, LLC*,[54] the parties to a stock purchase agreement agreed to have disputes over purchase-price adjustments referred to a "Settlement Auditor."[55] The agreement "explicitly provide[d] that the Settlement Auditor [would] resolve disputes over the calculation [of] Net Working Capital 'acting as an expert and not an arbitrator.'"[56] After the Settlement Auditor made its determination, the seller sued to confirm the results as if the determination had been an

---

[51] *Id.* at *2.

[52] *Id.*

[53] *Id.*

[54] 2017 WL 1732369 (Del. Ch. May 3, 2017).

[55] *Id.* at *3.

[56] *Id.* at *16.

arbitral award. The buyers moved to dismiss, arguing that the procedure was not an arbitration and that an order confirming it would conflict with the bargained-for language of the agreement.[57] Vice Chancellor Slights dismissed the case, giving controlling weight to the parties' contractual stipulation that the Settlement Auditor had acted as an expert and not an arbitrator.[58]

The Delaware Supreme Court also recently considered the distinction between an expert determination and an arbitration in *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*.[59] The parties to a purchase agreement agreed to a complex set of purchase-price adjustment provisions that called for disputes to be submitted to an independent auditor. The auditor "was to act 'as an expert and not as an arbitrator,' had to issue its decision in the form of a 'brief written statement' in an expedited time frame of 30 days, and had to rely on the parties' written submissions as the sole basis for its decision."[60] Disputes arose about whether the seller's historical treatment of certain items complied with GAAP, with the buyer arguing that it could modify the seller's historical treatment because it did not comply with GAAP. The buyer sought to have the independent auditor decide this issue. The Supreme Court agreed with the seller that the independent auditor lacked authority to make that decision. The high court noted that the agreement

---

[57] *Id.*

[58] *Id.* at *16-17.

[59] 166 A.3d 912 (Del. 2017).

[60] *Id.* at 915 (footnotes omitted).

21

"states in multiple places that the auditor was acting 'as an expert and not as an arbitrator.'"[61] The high court further explained that "the Independent Auditor did not have a wide-ranging brief to adjudicate all disputes" arising under the agreement "but rather one confined to a discrete set of narrow disputes."[62]

To my mind, these cases demonstrate that Delaware has not elided the distinction between expert determinations and arbitrations, nor have our courts applied arbitral principles to all contractual dispute resolution mechanisms. This outcome comports with Delaware's position as "a freedom of contract state, with a policy of enforcing the voluntary agreements of sophisticated parties in commerce."[63] As Chief Justice Strine recognized while writing as Chancellor on this court, "Delaware is a state that respects the freedom of contract. Thus, when two parties have a contract on which payment must be made, they are free to determine the basis for that payment."[64] "When a contract plainly

---

[61] *Id.* at 931.

[62] *Id.*

[63] *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008) (Strine, V.C.); *see also, e.g.*, *NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 (Del. 2015) ("Delaware law . . . seeks to ensure freedom of contract and allow parties to enforce their bargains in our courts."); *ev3, Inc. v. Lesh*, 114 A.3d 527, 529 n.3 (Del. 2014) (holding that "Delaware courts seek to ensure freedom of contract and promote clarity in the law in order to facilitate commerce" and collecting cases).

[64] *Senior Hous.*, 2013 WL 1955012, at *24 (footnote omitted); *see also Alliant Techsystems*, 2015 WL 1897659, at *1 (explaining that contractual dispute resolution mechanisms "are creatures of contract and counterparties to a transaction are free to contractually order their affairs as they wish. The critical issue for the Court to decide here is what the shared intentions of the contracting parties were then they entered the Merger Agreement.").

says that a contractual input (the value of a certain property) will be determined by an appraiser selected in accordance with the contract's terms, that is what it plainly means."[65] An expert determination—whether by an appraiser, an auditor, or a different type of expert—is not an arbitration unless the parties specifically "designate that expert as an arbitrator for that purpose," thereby invoking the body of law governing arbitrators.[66] The court interprets and enforces the contract provisions governing the expert determination; the court does not apply arbitral principles.[67]

In arguing the contrary position, the Seller relies on three Delaware cases: *Avnet, Inc. v. H.I.G. Source, Inc.*;[68] *SRG Global, Inc. v. Robert Family Holdings, Inc.*;[69] and *Viacom International Inc. v. Winshall*.[70] Each applied arbitral principles to an expert determination. Upon closer analysis, however, the decisions did so because the parties joined issue over those arbitral doctrines.

The *Avnet* decision involved a purchase-price adjustment provision that called for disputes to be submitted to an accountant.[71] The agreement empowered the accountant to

---

[65] *Senior Hous.*, 2013 WL 1955012, at *25.

[66] *Id.*

[67] *Id.*

[68] 2010 WL 3787581 (Del. Ch. Sept. 29, 2010).

[69] 2010 WL 4880654 (Del. Ch. Nov. 30, 2010).

[70] 72 A.3d 78.

[71] 2010 WL 3787581, at *2.

resolve "all matters (but only such matters) that remain in dispute relating to the Closing Balance Sheet, Merger Consideration Components and Aggregate Merger Consideration."[72] The parties disagreed about aspects of the purchase-price adjustments, and the buyer filed suit. The seller moved to dismiss the complaint and framed its arguments using the doctrines of substantive and procedural arbitrability. Neither party posited that the agreement contemplated an expert determination. The decision framed the issue to be decided using the arbitral concepts that the parties advanced: "The parties agree that the sole question to be resolved on the pending motion is whether this Court or the arbitrator should decide HIG Source's challenge to the arbitration."[73] Presented with those arguments, the court held that the buyer's objections raised issues of substantive arbitrability.

Months later, matters unfolded similarly in *SRG Global.* An agreement governing the sale of real estate provided that if any disputes arose over reimbursement for the cost of environmental remediation, then an environmental expert would "resolve such issues," and the expert's decision would be "final and binding on the parties."[74] The parties disagreed over an assortment of issues, and the buyer filed suit. The seller moved to dismiss, arguing that the issues presented questions of procedural arbitrability that the

---

[72] *Id.*

[73] *Id.* at *5.

[74] 2010 WL 4880654, at *2.

expert should decide. Unlike in *Avnet*, the buyer argued that the expert procedure was not an arbitration, then argued in the alternative that the disputes were matters of substantive arbitrability for the court to decide. The seller countered that the parties' agreement was broad enough to refer the issue of substantive arbitrability to the arbitrator (as the parties labeled the expert). With the parties' briefing steeped in the language of arbitration, this court concluded that the disputes presented "questions of procedural arbitrability that the arbitrator should decide" and dismissed the lawsuit on that basis.[75] The court briefly addressed the seller's argument that the expert determination was not an arbitration, observing that the buyer's "earlier filings" had "classif[ied] the dispute resolution process here as arbitration"[76] and relying on one side of the federal circuit split to support treating the expert as an arbitrator.[77]

The final case is *Viacom*, which concerned a dispute over an earn-out. The merger agreement called for the parties to submit any disputes over the calculation of the earn-out to the "Resolution Accountants." The agreement provided that "[t]he scope of the Resolution Accountants['] engagement . . . shall be limited to the resolution of the Earn-Out Disagreements, and the recalculation of the [Earn-Out] . . . in light of such resolution, and [the Resolution Accountants] shall be deemed to be acting as experts and not as

---

[75] *Id.* at *1.

[76] *Id.* at *5.

[77] *Id.*

arbitrators."[78] The agreement also provided that "[t]he resolution of the dispute by the Resolution Accountants will be a final, binding and conclusive resolution of the parties' dispute, shall be non-appealable, and shall not be subject to further review."[79] Seemingly in tension with that language, the agreement used arbitration-style language when framing the scope of possible review, stating not only that the determination "shall be final and binding on all parties," but also that "no such party shall have the right to bring any claim disputing such final determination, in the absence of fraud or manifest error."[80]

After the Resolution Accountants made a determination, the purchaser filed suit to set it aside, and the seller countersued to confirm the determination as an arbitral award under the FAA. In its complaint, the purchaser alleged that the resolution process was not an arbitration. Nevertheless, during briefing at the trial level, the purchaser conceded that "for purposes of the pending motions, . . . the Resolution Accountants' Determination may be reviewed under [FAA] standards."[81] Then-Chancellor Strine treated the concession as binding, deemed the parties to have agreed to resolve the dispute under the FAA, and confirmed the determination on that basis.[82] While discussing the reasonableness of the

---

[78] *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *2 (Del. Ch. Aug. 9, 2012) (Strine, C.).

[79] *Id.* at *3.

[80] *Id.*

[81] *Id.* at *10.

[82] *Id.* at *11.

purchaser's concession, however, he cited *Avnet*, *SRG Global*, and the side of the federal circuit split which holds that any binding dispute resolution mechanism falls within the scope of the FAA's definition of arbitration.[83]

On appeal, the Delaware Supreme Court affirmed. Because of how the matter had been framed below, the high court did not confront the distinction between an expert determination and an arbitration. Instead, the high court noted that "[t]he parties agree that Viacom's challenge to the [Resolution Accountants'] determination is governed by the [FAA]."[84] The Supreme Court held that "[i]f the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator."[85]

In my judgment, *Avnet*, *SRG Global*, and *Viacom* are distinguishable. In each case, the parties either conceded that the FAA governed (*Viacom*), treated the procedure as an arbitration (*Avnet*), or focused prominently and predominantly on arbitral doctrines (*SRG Global*).[86] To my mind, these cases do not outweigh the nearly four decades of Delaware

---

[83] *Id.* at *11 n.78.

[84] *Viacom*, 72 A.3d at 80.

[85] *Id.* at 84.

[86] *See Kuhn*, 990 A.2d at 397 (distinguishing prior Delaware Supreme Court case that applied a "referee provision" as an arbitration clause and holding that decision was not precedential where "the parties did not litigate, nor did we consider whether that language constituted an arbitration clause" and where "the parties did not dispute that the referee clause acted as an arbitration provision").

decisions that treat an expert determination as something different, including the Delaware Supreme Court's most recent pronouncement in *Chicago Bridge*.

## 2. What Type Of Proceeding Does The Merger Agreement Contemplate?

Determining what type of dispute resolution mechanism the parties have agreed to presents a question of contract interpretation. The Merger Agreement is governed by Delaware law.[87] Under Delaware law, "[w]hen interpreting a contract, the role of a court is to effectuate the parties' intent."[88] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement construing the agreement as a whole and giving effect to all its provisions."[89] "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[90]

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[91] "[W]here a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or

---

[87] Compl. Ex. C § 9.4.

[88] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[89] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted) (quoting *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014)).

[90] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) (footnote omitted).

[91] *Id.*

ordinary meaning."[92] When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms.[93] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[94]

In this case, the Merger Agreement clearly states: "In resolving the items in dispute, the parties agree that the Accounting Firm shall be acting as an accounting expert only and not as an arbitrator and shall not import or take into account usage, custom or other extrinsic factors."[95] This language explicitly calls for the role of "expert" while disclaiming the role of "arbitrator." In *ASQR*, Chief Justice Strine held that similar language invoked "a narrow dispute resolution mechanism that is designed to take advantage of the technical expertise"

---

[92] *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007) (Strine, V.C.).

[93] *See Hazout v. Tsang Mun Ting*, 134 A.3d 274, 290 n.58 (Del. 2016) (collecting authorities demonstrating that where the legislature uses a term with a "well-settled legal meaning" it uses the term in its "legal sense"); *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007) (looking to "both legal and non-legal definitions" of "to make" in interpreting statute of limitations); *cf. Am. Legacy Found. v. Lorillard Tobacco Co.*, 2005 WL 5775806, at *11 (Del. Ch. Aug. 22, 2005) (presuming use of words with "no accepted blackletter legal definition . . . was an implicit agreement by the parties to avoid the use of legal terms of art").

[94] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[95] Compl. Ex. C § 2.8(b)(ii).

of the expert.[96] More recently, the *Chicago Bridge* decision remarked that this language "by itself has been read to narrow the scope of the expert's domain."[97]

The *Chicago Bridge* decision cited a report prepared by the Committee on International Commercial Disputes of the New York City Bar Association which sought to "propose a coherent test to distinguish expert determination and arbitration and to explain the essential differences between these two alternative forms of private, contractual dispute resolution."[98] After reviewing domestic decisions, foreign cases, and academic authorities, the committee recommended that parties who wished to obtain an expert determination from an accountant, rather than inviting an arbitration, should "state that the accounting firm is to 'act as an expert and not as an arbitrator.'"[99] The Merger Agreement uses that language.

Under English law, the "expert not arbitrator" language is the standard phrase that parties use to invoke an expert determination. As one authoritative treatise explains, "[t]he most commonly encountered wording is that the expert is 'to act as an expert and not as an arbitrator.'"[100] The authors remark that "[t]he use of the expression 'as an expert and not

---

[96] 2009 WL 1707910, at *2.

[97] 166 A.3d at 931.

[98] New York Bar Report, *supra*, at 3.

[99] *Id.* at 8; *see also id.* at 38 & n.85 (collecting cases analyzing clauses containing the language), 52, 54, 67 (incorporating language in draft suggested "expert determination clause").

[100] Freedman & Farrell, *supra*, at 160.

as arbitrator' is now so common that it is difficult to conceive of a case in which a court would not treat those words as meaning exactly what they say."[101]

In some cases, it might be difficult to determine whether the parties had selected an expert determination, arbitration, or something else. If parties have not stated their intention explicitly, then a court will have to examine other aspects of the contract or even turn to extrinsic evidence. It is even possible to envision a setting where the parties included "expert not arbitrator" language, but then constructed a dispute resolution provision that had numerous features associated with commercial arbitration. Perhaps in such a case a court would disregard the stipulation or determine that the agreement was ambiguous and turn to extrinsic evidence. As Vice Chancellor Slights recently acknowledged "in certain instances an 'expert's' decision in a dispute resolution proceeding, or the parties' course of conduct during a dispute resolution proceeding, may be tantamount to an arbitration."[102] While Chancellor, Chief Justice Strine likewise acknowledged in *Viacom* that nomenclature alone would not be dispositive.[103]

---

[101] *Id.* at 412; *see also id.* at 483 (incorporating language in suggested form expert determination agreement).

[102] *EMSI*, 2017 WL 1732369, at *16 (footnotes omitted).

[103] *See* 2012 WL 3249620, at *11 ("[T]he FAA limits intrusive judicial review of any dispute resolution proceeding within the FAA's definition of arbitration, regardless of nomenclature such as in the Merger Agreement."); *see also McDonnell Douglas*, 858 F.2d at 830 (determining proceeding before it constituted arbitration and deeming it "irrelevant that the contract language in question does not employ the word 'arbitration' as such"); *Bryson v. Gere*, 268 F. Supp. 2d 46, 52 (D.D.C. 2003) ("Courts have held that the 'magic words' such as 'final' or 'binding' are unnecessary when the clause includes certain other indications of an intent to consent to binding arbitration."); *AMF*, 621 F. Supp. at 460 ("No

Jurisdictions differ on how to resolve cases where the parties have not plainly expressed their intent and the distinction between an expert determination and an arbitration is less clear. The federal courts of appeal have split on the question, with the majority asking "how closely [the procedure] resembles classic arbitration."[104]

Different states likewise have adopted different approaches.[105] New York, which has a well-developed body of expert-determination jurisprudence (albeit one that typically uses the language of appraisal or appraisement), places heavy weight on the scope of the provision and the procedure that the parties agree to follow. As to scope,

---

magic words such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed to obtain the benefits of the [FAA].").

[104] *Evanston Ins.*, 683 F.3d at 693; *see also Salt Lake*, 390 F.3d at 689-90; *Fit Tech*, 374 F.3d at 7. The United States Court of Appeals for the Second Circuit has held that, where "the language clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution," the parties have submitted to arbitration. *Bakoss*, 707 F.3d at 143 (internal quotation marks omitted) (quoting *McDonnell Douglas*, 858 F.2d at 830). This test necessarily treats expert determinations as arbitrations. Two courts of appeals have either expressly declined to address the issue or managed to sidestep it. *See Omni Tech Corp. v. MPC Solutions Sales, LLC*, 432 F.3d 797, 800-01 (7th Cir. 2005) (Easterbrook, J.) (finding it "unnecessary to decide whether state or federal law governs the characterization of a dispute-resolution process as one for 'arbitration,' and, if the question is federal, whether every provision for a 'final and binding' decision should be called an agreement to arbitrate" to determine whether the agreement at issue warranted a stay because "whether or not it carries the label 'arbitration,' it must be implemented in full"); *JGC Rock Assocs. v. Standard Fire Ins. Co.*, 1995 WL 364049, at *1 (D.C. Cir. 1995) (per curiam) ("We need not decide whether an appraisal is an arbitration for purposes of an immediate appeal under the Federal Arbitration Act.").

[105] *Compare, e.g.*, 15 Steven Plitt et al., *Couch on Insurance* § 209:16 n.1, Westlaw (database updated June 2018) (collecting state cases finding that an appraisal did not constitute arbitration), *with id.* § 209:16 n.4 (collecting cases finding opposite).

[a]n agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties, . . . while the agreement for appraisal extends merely to the resolution of the specific issues of actual cash value and the amount of loss, all other issues being reserved for determination in a plenary action.[106]

As to process, "[a]ppraisal proceedings are . . . attended by a larger measure of informality and appraisers are not bound to the strict judicial investigation of an arbitration."[107]

The New York Bar Report similarly suggests that when difficult cases arise, courts should consider the "type and scope of authority" given to the party charged with resolving the dispute:

> We suggest that . . . the fundamental difference between an expert determination and arbitration can be found in the type and scope of authority that is being delegated by the parties to the decision maker. In the case of a typical expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation. The decision maker's authority is limited to its mandate to use its specialized knowledge to resolve a specified issue of fact. The parties agree that the expert's determination of the disputed factual issue will be final and binding

---

[106] *In re Delmar Box Co.*, 127 N.E.2d 808, 811 (N.Y. 1955); *see also State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 890 (Tex. 2009) ("[T]he scope of appraisal is damages, not liability.").

[107] *Delmar Box*, 127 N.E.2d at 811 (internal quotation marks and citations omitted); *see also Ne. Fin. Corp. v. Ins. Co. of N. Am.*, 757 F. Supp. 381, 383-84 (D. Del. 1991) (applying Delaware law) ("One distinction [between appraisal and arbitration] commonly drawn is that arbitration is typically conducted in quasi-judicial proceedings with hearings, notice of hearings, oaths of witnesses and constitutes a final settlement of the dispute between the parties. Appraisal, on the other hand, is generally more informal in that the appraisers are not under oath, are not obliged to hear evidence and may proceed by ex parte investigation." (citation omitted)).

Lest there be any doubt, these cases involve contract provisions that assign a valuation task to an appraiser. They do not refer to statutory proceedings under an appraisal statute like Section 262 of the Delaware General Corporation Law. *See* 8 *Del. C.* § 262.

on them. The parties are not, however, normally granting the expert the authority to make binding decisions on issues of law or legal claims, such as legal liability.

If the proceeding is an arbitration, this means that the parties have intended to delegate to the decision maker authority to decide all legal and factual issues necessary to resolve the matter. The grant of authority to an arbitrator, but not to an expert, is analogous to the powers of a judge in a judicial proceeding. The parties expect the arbitrator to rule on legal claims, legal causes of action and to award a legal remedy, such as damages or injunctive relief. The parties, by agreeing to arbitration, are selecting a form of dispute resolution that by its very definition is understood as granting the decision maker the authority to make binding decisions of both law and fact.[108]

The broader academic literature also analyzes the type and scope of authority given to the party resolving the dispute,[109] while recommending that a court also consider the procedures that the party is directed to follow.[110]

---

[108] *Id.* at 4.

[109] *See, e.g.*, 4 Am. Jur. 2d *Alternative Dispute Resolution* § 3, Westlaw (database updated May 2018) ("An agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties upon which award a judgment may be entered, whereas an agreement for appraisal extends merely to the resolution of the specific issues of actual cash value and the amount of loss, all other issues being reserved for determination in a plenary action before the court."); 6 C.J.S. *Arbitration* § 2, Westlaw (database updated June 2018) ("While arbitration determines the rights and liabilities of the parties, appraisal merely binds the parties to have the extent or amount of a loss determined in a particular way."); 21 Richard A. Lord, *Williston on Contracts* § 57:8, Westlaw (database updated May 2018) ("[T]he final test should be whether or not the parties intended the 'arbitrators' to determine ultimate liability or merely facts incidental thereto."); 1 Thomas H. Oehmke & Joan M. Brovins, *Commercial Arbitration* § 1:11, Westlaw (database updated May 2018) ("Arbitration clauses which send the entire controversy to an arbitral tribunal divest the court of jurisdiction over the merits, while appraisal simply sets the amount of loss, leaving the liability determination to be negotiated or litigated. While appraisal may settle the issue of damages, it is not subject to the FAA because it does not settle all liability, nor does it allocate liability to one or more respondents." (footnotes omitted)).

[110] *See, e.g.*, 4 Am. Jur. 2d *Alternative Dispute Resolution* § 3 ("[A]ppraisers are

34

In my view, this is not the type of difficult case that requires laborious analysis. The parties evinced their clear intent in the Dispute Resolution Provision by using "expert not arbitrator" language. The Dispute Resolution Provision does not contain any features that might render this language ambiguous. Just as this court has enforced provisions that plainly define a dispute resolution mechanism as an "arbitration,"[111] this decision enforces a provision that plainly calls for an expert determination.

### 3.    Who Determines The Scope Of The Accounting Firm's Jurisdiction?

Holding that the Dispute Resolution Provision calls for an expert determination means that the contract itself determines the scope of the expert's jurisdiction.[112] "Where

---

generally expected to act on their own skill and knowledge. They may reach individual conclusions and are required to meet only for the purpose of ironing out differences in the conclusions reached, and they are not obliged to give the rival claimants any formal notice or to hear evidence, but may proceed by ex parte investigations so long as the parties are given the opportunity to make statements and explanations with regard to matters in issue. Arbitrators, on the other hand, must meet together at all hearings. They act quasi-judicially and may receive the evidence or views of a party to the dispute only in the presence, or on notice to, the other side, and may adjudge the matters to be decided only on what is presented to them in the course of an adversary proceeding." (footnotes omitted)); 1 Martin Domke, Gabriel Wilner & Larry E. Edmonson, *Domke on Commercial Arbitration* § 1:3, Westlaw (database updated May 2018) ("The [expert] determination is based on personal knowledge and experience of the appraiser who must observe procedural rules to an even less degree than an arbitrator."); Plitt et al., *supra*, § 209:8 ("An appraisal requires neither a hearing nor the exercise of judicial discretion.").

[111] *See, e.g.*, *HDS Inv. Hldg. Inc. v. The Home Depot, Inc.*, 2008 WL 4606262, at *5 (Del. Ch. Oct. 17, 2008) (applying arbitrability analysis where agreement stated "Neutral Auditors shall act as an arbitrator"), *abrogated by Viacom*, 72 A.3d 78; *Mehiel v. Solo Cup Co.*, 2005 WL 1252348, at *5 (Del. Ch. May 13, 2005) (same).

[112] Learned commentators use the term "jurisdiction" to describe "the nature and scope of the expert's task." Freedman & Farrell, *supra*, at 234.

the parties have entrusted the power of decision to an expert, the extent of the expert's jurisdiction depends on the terms of the contract between the parties."[113]

Whether the Accounting Firm has jurisdiction to construe the scope of the Dispute Resolution Provision and determine whether it can consider extrinsic evidence presents a question of contract interpretation. "[T]here is no general principle either that the expert *always* has exclusive jurisdiction to decide the meaning of the terms of the contract, or that the expert *never* has exclusive jurisdiction to do so."[114] Rather, "[i]n each case it is necessary to examine the contract itself in order to decide what the parties intended should be a matter for the exclusive decision of the expert."[115] Parties have a range of options when choosing an adjudicator to determine the scope of the expert's jurisdiction. The contract can specify that the expert determines the scope of its own jurisdiction. The contract can specify a plenary adjudicator, such as an arbitrator, to decide issues under the contract that would include the scope of the expert's jurisdiction. The contract can also leave that function to the courts. The parties can select a particular court through a forum-selection clause, or the contract can remain silent and allow any court that can exercise

---

[113] *Id.* at 245.

[114] *Id.* at 256.

[115] *Id.*

subject matter jurisdiction over the dispute and personal jurisdiction over the parties to act in that role.[116]

The Merger Agreement does not specifically say whether or not the Accounting Firm can construe the Dispute Resolution Provision. Although Delaware cases have not expressly adopted a default rule for use when the agreement is silent, the logic of the decisions suggests that an expert charged with making a narrow determination will not have authority to interpret the governing agreement unless the contract says so. The *Chicago Bridge* decision emphasized that the accounting expert in that case "did not have a wide-ranging brief to adjudicate all disputes . . . under the Purchase Agreement, but rather one confined to a discreet set of narrow disputes."[117] The *ASQR* court similarly described an expert as having "a limited role: to apply her industry-specific knowledge to answer a technical, industry-specific question that [is] properly teed up for the Referee through the parties' own Review Process."[118] Both decisions held that the broader legal issues that the parties sought to litigate had to be decided in a plenary action.

---

[116] *See id.* at 132 (discussing "multi-tier dispute resolution" under which "interim disputes may be referred to an expert or experts . . . and all other kinds of disputes and all those which have not yet been resolved go to arbitration or litigation"); *see also, e.g.*, *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1095 (Del. Ch. 2006) (interpreting an agreement that included both a general arbitration provision and a narrower expert determination provision).

[117] 166 A.3d at 931.

[118] 2009 WL 1707910, at *7.

The directional thrust of these decisions comports with the New York Bar Report, which observes that when parties have called for an expert determinations, they "normally have not granted the expert the authority to make binding decisions on general issues of law or legal disputes."[119] As result, "the expert is neither expected nor authorized to make final and binding rulings on issues of law."[120] British authorities reach the same conclusion.[121]

In this case, nothing in the Merger Agreement suggests that the parties intended for the Accounting Firm to decide legal disputes as part of the dispute resolution process. The Dispute Resolution Provision instead structures a tailored procedure that assigns only narrow questions to the expert. All other issues go to this court, which is the plenary adjudicator under the forum-selection clause. The Accounting Firm therefore cannot

---

[119] New York Bar Report, *supra*, at 15.

[120] *Id.* at 27

[121] Freedman & Farrell, *supra*, at 246 (explaining that a "question of interpretation of the words of the contract on which the parties hold opposing views" is "traditionally treated by the court as a question of law"). English law recognizes that experts may have to engage in some incidental instances of contract interpretation. *See id.* at 256 ("There are suggestions in some cases that, in the absence of indications to the contrary, an expert has jurisdiction to decide questions of interpretation which necessarily arise in the course of the determination."). English law also appears to grant accounting firms more leeway to engage in interpretation. *See id.* at 258 ("Where accountants have been appointed to determine disputes . . . the courts usually decide that the expert is to decide questions of interpretation of the contract which arise. Such disputes often turn on the meaning of expressions which the nominated expert would be expected to be familiar with.").

interpret the Merger Agreement or determine whether it has the jurisdiction to consider extrinsic evidence.

## B. Can Ernst & Young Consider Extrinsic Evidence?

This decision has determined that this court must interpret the Merger Agreement and determine whether the Accounting Firm has jurisdiction to consider extrinsic evidence. Under the plain language of the Dispute Resolution Provision, the Accounting Firm cannot consider extrinsic evidence. The Seller therefore may not submit the term sheets, offering circular, and other extrinsic evidence to Ernst & Young.

Regardless of whether the allocation dispute were viewed as arising under the Pre-Closing Section or the Post-Closing Section, the plain language of the Dispute Resolution Provision controls. The Pre-Closing Section specifies that if the parties cannot reach agreement on the tax forms, then "[d]ispute resolution provisions corresponding to those in Section 2.8(b) shall apply."[122] The Post-Closing Section states:

> If [the Buyer] and the [Seller] fail to reach an agreement within thirty (30) days after the [Seller] notifies [the Buyer] that the [Seller] disputes any item(s) reflected on [the Buyer's] schedule, the determination of the disputed item or items shall be made by the Accounting Firm following the general procedures set forth in Section 2.8(b)(ii), *mutatis mutandis*, whose decision shall be final and whose fees shall be shared equally by [the Buyer], on the one hand, and the [Seller] on the other hand.[123]

Section 2.8(b)(ii) is the Dispute Resolution Provision. It specifies that the Accounting Firm "shall not import or take into account usage, custom or other extrinsic factors" and prohibits

---

[122] Compl. Ex. C § 5.2(a)(i).

[123] *Id.* § 5.2(a)(ii).

"*ex parte* conferences, oral examinations, testimony, depositions, discovery or other form of evidence gathering or hearings."[124] In my view, this language is plain and unambiguous, and it prevents Ernst & Young from considering the term sheets or the offering circular.

The Seller contends that a proper reading of the term "*mutatis mutandis*" would allow the Accounting Firm to consider extrinsic evidence when considering tax questions under the Post-Closing Section, rather than accounting questions under the purchase-price adjustments section. *Mutatis mutandis* is a "useful Latinism" meaning "the necessary changes having been made."[125] It is useful to effectuate "minor adjustments to individual provisions" when incorporating them by reference from another instrument or another section in the same instrument.[126] Because "it would be time-consuming to note each such adjustment, it's conventional to accomplish this instead in one fell swoop with the Latin phrase *mutatis mutandis*."[127] The phrase's common English counterpart would be "together with any necessary conforming changes."[128]

The Seller believes that a necessary change to the Dispute Resolution Provision when the Accounting Firm acts as a tax accountant would be to permit the Accounting Firm to consider extrinsic materials necessary to resolve tax questions, such as sources of

---

[124] *Id.* § 2.8(b)(ii).

[125] *In re IAC/InterActive Corp.*, 948 A.2d 471, 508 (Del. Ch. 2008).

[126] Kenneth A. Adams, *A Manual of Style for Contract Drafting* 387 (4th ed. 2017).

[127] *Id.*

[128] *Id.*

positive law and guidance from tax authorities. Once the extrinsic evidence door is open, then the Seller believes that the term sheets and the offering circular can pass through it.

In my opinion, the use of "*mutatis mutandis*" simply recognizes that the Accounting Firm would be considering tax disputes rather than purchase-price adjustments. The Accounting Firm could consider similar sources of authority in both contexts. For tax disputes, the Accounting Firm could consider statutes, case law, guidance from tax authorities, and the like. For accounting disputes, the Accounting Firm could consider officially established accounting principles from organizations like the Financial Accounting Standards Board, technical bulletins, and similar materials.[129] In neither scenario could the Accounting Firm consider extrinsic evidence about the proper interpretation of the contract. The ability to consider the former does not imply the ability to consider the latter.

The Seller also has argued that the exclusion of "other extrinsic factors" does not mean the exclusion of "extrinsic evidence." The Seller argues that these terms must mean different things and deploys the canon of *ejusdem generis* to bolster its interpretation. This canon posits that "where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in

---

[129] *See Alliant Techsystems*, 2015 WL 1897659, at \*10-11 (recognizing that an accounting firm serving "as an expert and not as an arbitrator" should not be limited "to resolving purely math questions" or merely engaging in a "bean-counting exercise" but "fairly may be called upon to apply normal accounting principles (*i.e.*, GAAP) when serving the function of an expert").

their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned."[130]

As I read the Merger Agreement, the exclusion of "other extrinsic factors" encompasses extrinsic evidence and is sufficiently of a piece with "usage [and] custom" to satisfy *ejusdem generis*. A court can look to usage and custom to clarify an ambiguity.[131] So too with extrinsic evidence. Furthermore, courts periodically use "extrinsic factors" as

---

[130] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004) (internal quotation marks omitted) (quoting *Petition of State*, 708 A.2d 983, 988 (Del. 1998)); *see also Hall St. Assocs. LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) ("Under [the rule of *ejusdem generis*], when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows.").

[131] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) ("[E]xtrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." (internal quotation marks omitted) (quoting *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834-35 (Del. Ch. 2007))); *accord Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 761 n.122 (Del. Ch. 2008); *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003); *In re Explorer Pipeline Co.*, 781 A.2d 705, 714 (Del. Ch. 2001); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) ("In construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."). *See generally* 21A Am. Jur. 2d *Customs and Usages* § 26, Westlaw (database updated May 2018) ("Ambiguity—where words are reasonably susceptible to more than one interpretation—permits the introduction of extrinsic evidence to interpret those words, including evidence of course of dealing and custom usage of trade."); Lord, *supra*, § 34:1 ("Parol or extrinsic evidence of custom or usage may be admitted to explain the meaning of terms that would otherwise be ambiguous, uncertain or equivocal as used in a contract."); *id.* § 34:7 ("[E]xtrinsic evidence can include overt statements and acts of the parties, the business context, prior dealings between the parties, business custom, and usage in the industry.").

a synonym for "extrinsic evidence."[132] This language limits the Accounting Firm to the language of the contract and operative accounting and tax principles.

Under the plain meaning of the Dispute Resolution Provision, Ernst & Young cannot consider extrinsic evidence such as the term sheets or the offering circular.

## C.    Other Issues

The Buyer seeks a declaration that the contract does not impose "a flat obligation to pay [the Seller] 40% of the [transaction-related deductions] in all cases."[133] The Buyer sought this declaration because it believed that the Seller is advancing that argument, but the Seller has represented that it is not taking this position. The Seller says it has argued

---

[132] *See, e.g.*, *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers v. United Techs. Corp.*, 230 F.3d 569, 576 (2d Cir. 2000) ("Only when provisions are ambiguous may courts look to extrinsic factors—such as bargaining history, past practices, and other provisions in the CBA—to interpret the language in question."); *Shell Oil Co. v. Fed. Power Comm'n*, 334 F.2d 1002, 1008 (3d Cir. 1964) ("Shell argues that in the above cited case the Court held that evidence of extrinsic factors was admissible because of an admitted ambiguity in the contract."); *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 815 F. Supp. 1488, 1514 (D. Del. 1993) ("To the extent the language may be ambiguous, extrinsic factors further support Pharos' interpretation of the Settlement Agreement."); *Urbaitis v. Commonwealth Edison*, 575 N.E.2d 548, 552 (Ill. 1991) ("Absent an ambiguity in the deed, the intention of the parties must be discerned solely from the language of the instrument, without consideration of extrinsic factors."); *Wilcox v. Riverside Park Enters., Inc.*, 505 N.E.2d 526, 535 (Mass. 1987) ("Because the clause is ambiguous, we may look to extrinsic factors to determine its appropriate scope."); *In re Laurin's Estate*, 424 A.2d 1290, 1293 (Pa. 1981) ("Use of the word 'give' alone, absent other language indicative of a decedent's intent to make either an inter vivos gift or a testamentary disposition, renders the writing ambiguous and necessitates consideration of extrinsic factors."); *DeMarco v. Travelers Ins. Co.*, 26 A.3d 585, 631 (R.I. 2011) ("Only when the document is absurd on its face . . . or ambiguous do we rely on extrinsic factors to give context to the parties' intent.").

[133] Defs.' Opening Br. at 57.

that (i) Ernst & Young could consider extrinsic evidence when resolving the tax dispute and (ii) tax law and other authorities prevented the Buyer from allocating the tax benefits as it did. This decision has now ruled that Ernst & Young cannot consider extrinsic evidence when resolving the tax dispute. The Seller remains free to present tax authorities to Ernst & Young and argue that the Buyer's tax position is incorrect. The Buyer's request for a broader declaration is moot.[134]

The Buyer relatedly seeks an injunction barring the Seller from advancing what the Buyer asserts is an incorrect contract interpretation before Ernst & Young. The Seller has represented that it is not advancing the contested argument before Ernst & Young. On the facts presented, I have no reason to question the representation. In any event, the argument relies on extrinsic evidence, which this decision has found cannot be submitted. The request for an injunction is moot.[135]

---

[134] *See XI Specialty Ins. Co. v. WMI Liquid. Tr.*, 93 A.3d 1208, 1216-17 (Del. 2014) (noting that by statute there must exist an "actual controversy" to issue a declaratory judgment and laying out the four-part test for the existence of an actual controversy).

[135] *See N. River Ins. Co. v. Mine Safety Appliance Co.*, 2013 WL 6713229, at *7 (Del. Ch. Dec. 20, 2013) ("[I]n line with the well-established principle that '[e]quity will not do a useless thing,' an injunction will 'not be granted where it would be ineffective to achieve its desired result.' (quoting *Walker v. Lamb*, 259 A.2d 663, 663 (Del. 1969); *New Castle Cty. v. Peterson*, 1987 WL 13099, at *3 (Del. Ch. June 30, 1987))), *aff'd*, 105 A.3d 369 (Del. 2014); *cf. State ex rel. Wier v. "Certain Unnamed Pictures Depicting Nudity and Sexual Conduct"*, 1976 WL 8271, at *3 (Del. Ch. Mar. 18, 1976) (declining to issue injunction because "in view of the unlikelihood that the act complained of will be repeated, an injunction would appear both unnecessary and ineffective").

In passing, the Buyer seeks a declaration that the Seller breached the Merger Agreement's requirement that "[t]he terms of appointment and engagement of the Accounting Firm shall be as reasonably agreed upon between the [Seller] and [the Buyer]."[136] The Buyer claims that the Seller's refusal to enter into an engagement letter on the Buyer's terms was unreasonable. In my view, the Seller advanced an argument that had a good faith basis. It is also not clear to me that the engagement letter contemplated by the Dispute Resolution Provision had to spell out the restrictions on Ernst & Young, as opposed to referencing the Merger Agreement. The Seller did not act unreasonably by refusing to sign off on the engagement letter and instead seeking to litigate this dispute. Judgment is entered in favor of the Seller on Count I of the counterclaim to the extent it seeks a declaration that the Seller breached the Merger Agreement.

In a related request, the Buyer seeks an injunction requiring the Seller to enter into an engagement letter with Ernst & Young consistent with this decision. A permanent injunction constitutes extraordinary relief.[137] "Declaratory judgments are self-executing and 'have the force and effect of a final judgment or decree.'"[138] An injunction at this stage

---

[136] Compl. Ex. C § 2.8(b)(ii).

[137] *See Sierra Club v. Dep't of Nat'l Res. & Envtl. Control*, 2006 WL 1716913, at *1 (Del. Ch. June 19, 2006) ("Although it remains clear in this case that no irreparable harm is threatened sufficient to justify the extraordinary relief of a permanent injunction, I nonetheless will briefly address the merits prong of the preliminary injunction standard."), *aff'd*, 919 A.2d 547 (Del. 2007).

[138] *Reed v. Brady*, 2002 WL 1402238, at *3 (Del. Ch. June 21, 2002).

is premature. The Buyer has not provided any reason to believe that the Seller will not comply with a final ruling from the Delaware courts.

### III.  CONCLUSION

Judgment is entered in favor of the Buyer on both counts of the complaint. Judgment is entered in favor of the Buyer on Count I of the counterclaim to the extent it seeks a declaration that the Accounting Firm must act within the limitations set by the Dispute Resolution Provision. Judgment is entered in favor of the Seller on Count I of the counterclaim to the extent it seeks a declaration that the Seller acted unreasonably by refusing to engage Ernst & Young before the resolution of this dispute. The request for a mandatory injunction in Count II of the counterclaim is denied. The requests for a declaration in Count III of the counterclaim and for a mandatory injunction in Count IV of the counterclaim are moot.

The parties shall confer as to whether there are additional issues that the court needs to address before it can enter a final judgment. Within thirty days, the parties shall report to the court. If there are no additional issues, then the parties shall submit a final judgment that is agreed upon as to form. If there are additional issues, then the parties shall submit a joint letter that identifies them and proposes a path for bringing this matter to final resolution at the trial level.